(125 App. Div. 697.)

PEOPLE v. JEINA.

(Supreme Court, Appellate Division, Second Department. April 24, 1908.)

1. HOMICIDE—EVIDENCE—ADMISSIBILITY.
    On a trial for homicide, the evidence showed that decedent assaulted a third person; that accused shot decedent; that decedent immediately turned on accused, who was only a few feet away; that accused then shot decedent again, inflicting a fatal wound. *Held*, that the evidence relating to the firing of the first shot was admissible to show accused's connection with the difficulty at the beginning, and his motive and belief when the fatal shot was fired, and whether he was justified.

2. SAME—SELF-DEFENSE—DUTY TO RETREAT.
    While it is the duty of one to avoid the necessity of shooting another, if possible, he is not obliged to retreat where the danger is imminent.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 26, Homicide, §§ 168–171.]

3. SAME—JUSTIFIABLE HOMICIDE—EVIDENCE.
    Evidence *held* not to support a verdict that a homicide was not justifiable within Pen. Code, § 205, defining justifiable homicide.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 26, Homicide, §§ 507–509.]

Appeal from Trial Term.

Adenria Jeina was convicted of murder in the second degree, and he appeals. Reversed, and new trial ordered.

Argued before JENKS, HOOKER, GAYNOR, RICH, and MILLER, JJ.

Thomas Kelby, for appellant.

Peter P. Smith (John F. Clarke, Dist. Atty., on the brief), for the People.

MILLER, J. The defendant appeals from a judgment convicting him of the crime of murder in the second degree. The only question presented by the record requiring consideration is whether the judgment is supported by the evidence.

It is undisputed that on the 13th day of August, 1906, the defendant shot and killed one Antonio Gambardello. The defense was that the homicide was justifiable. The defendant and the deceased were longshoremen employed on one of the South Brooklyn docks near the intersection of Conover and Pioneer streets. Their foreman was one Salvatora Richighi, the defendant's prospective brother-in-law. It was the custom of the longshoremen to gather at the dock, and the foreman selected such as he wanted and assigned them to work. Some time previous to the day of the homicide said foreman had discharged a brother of the deceased, and had compelled him to leave the dock. Shortly before 1 o'clock on said day a crowd of men, variously estimated from 150 to 300 or 400, were gathered about the gate opening upon the dock, and, while said foreman was selecting men to work, he got into an altercation with the deceased. The people's witnesses do not explain the cause of the quarrel; but, according to the testimony of two witnesses called by the defense, it was begun by the deceased, who threatened said foreman because the latter refused to assign him work. At any rate, a scuffle between them ensued, and the defendant, who was standing nearby, fired three shots from a pistol, two of which entered the left breast of the deceased, inflicting mortal wounds. The only witness called by the people who testified definitely to what occurred was a brother of the deceased. He testified that said foreman and the deceased slapped each other in the face, whereupon the defendant shot the deceased in the back; that the latter then turned and fell on his back to the ground, and, after he had thus fallen, the defendant leaned over him, and fired three more shots. The other witnesses for the people testify to seeing something of the quarrel between the foreman and the deceased, and to hearing the shots, but none of them were able to detail definitely the circumstances of the shooting, and they accounted for their inability to see exactly what occurred by the presence of the large number of people. They all agree, however, with the testimony of witnesses for the defendant to the effect that the deceased walked some distance after he was shot, that he fell upon his face, and that the defendant did not follow him nor shoot after he had fallen, and, as already stated, the only wounds on the body of the deceased were the two entering the left breast. One of the people's witnesses who saw something of the occurrence from a distance testified that the deceased had some object in his hand, which the witness was not near enough to identify. The brother of the deceased testified positively that he did not have a weapon in his hands, and the other witnesses for the people testified that they did not see him have any weapon. The defendant's version of the transaction was that, when the quar-

rel between Richighi and the deceased began, the latter drew a long knife; that Richighi seized him by the wrist, but in the struggle slipped and fell, and that the deceased was about to strike Richighi with the knife when the defendant fired the pistol behind him; that he immediately turned and advanced upon the defendant, who was only a few (one witness says eight) feet away; that the defendant called upon him to stop, and, upon his continuing to advance, fired twice, and then, as the deceased staggered away, ran upon the dock, where he was captured. The defendant testified that, when he fired the first shot, he believed the life of Richighi was in danger, and when he fired the other two he believed his own was in danger. He is corroborated as to the principal details of the shooting by four apparently disinterested witnesses. Two police officers who arrived upon the scene very soon after the shooting testified to finding an open knife by the side of or partly under the body of the deceased, and one of them produced the knife. There is testimony that, some time after the affair, the body of the deceased was moved from where he fell to another place a short distance away; but it is evident from the description of the location and position of the body as described by said policemen, when they first saw it, that it was where the deceased had first fallen.

Section 205 of the Penal Code provides:

"Homicide is also justifiable when committed, either (1) in the lawful defense of the slayer, or of his or her husband, wife, parent, child, brother, sister, master or servant, or of any other person in his presence or company, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony, or to do some great personal injury to the slayer, or to any such person, and there is imminent danger of such design being accomplished."

The principal question for the jury to determine was whether, when the first shot was fired, the defendant had reasonable ground to apprehend a design on the part of the deceased to do great personal injury to Richighi, and that there was imminent danger of such design being accomplished, and whether, when the shot inflicting the mortal wound was fired, he had reasonable ground to apprehend a design to do great personal injury to himself, and that there was imminent danger of its being accomplished. Of course, the appearances and his belief when the first shot was fired are only important as showing how his connection with the affair began and as shedding light on his motive and belief when the fatal shot was fired, and as bearing upon the rule that the defendant was not justified in shooting until he had done everything in his power to avoid the necessity. It is evident that the principal question litigated on the trial was whether the deceased had the knife. The testimony of the brother of the deceased is so clearly at variance with the established facts of the case that it is entitled to but little weight. The other negative testimony on this point is clearly overcome by the positive testimony of the defendant's witnesses, corroborated by one witness called by the people and by the very strong circumstance of the finding of the open knife under the body of the deceased. We may start, then, with the proposition that the credible evidence establishes the fact that the deceased had

an open knife in his hand when shot. It is likewise established that he started the quarrel with Richighi. He had a grievance against him because of the discharge of his brother. These two facts tend strongly to corroborate the testimony of the defendant and his witnesses, to the effect that the deceased was in the act of striking Richighi with the knife (it is described as being a foot long) when the defendant fired the first shot. If this were so, the defendant was justified in shooting to prevent what seemed imminent—the infliction of a grievous, if not mortal, wound on Richighi. If, then, the deceased turned and advanced upon him, it would seem that he was equally justified in shooting to save himself from what must have appeared to be and in fact was imminent danger. While it was his duty to avoid the necessity of shooting, if possible, it must not be overlooked that such things occur with great rapidity. These men were surrounded by a crowd; and, even if the crowd had not been there to impede his movements, the defendant was not obliged to turn his back upon danger so imminent. Another view of the case tends strongly to strengthen the defendant's position. It is nowhere suggested that he had any motive to kill the deceased. He had no quarrel with the latter, but merely intervened to protect his friend. The rule of reasonable doubt applied to every element of the case which the jury had to pass upon; and we think that a finding that the homicide was not justifiable is against the preponderance of the proof.

The judgment of conviction should be reversed, and a new trial ordered. All concur.