(158 App. Div. 186.)

### PEOPLE v. BUCCUFURRI.

(Supreme Court, Appellate Division, Second Department.　July 25, 1913.)

1. HOMICIDE (§ 118*)—SELF-DEFENSE—DUTY TO RETREAT.

A person attacked is not bound to retreat if such would imperil his safety the more, or if a reasonable man under the circumstances would be justified in believing that to retreat would add to the danger.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 168–171; Dec. Dig. § 118.*]

2. CRIMINAL LAW (§ 776*)—GOOD REPUTATION OF ACCUSED—EFFECT—DUTY TO CHARGE.

In a prosecution for murder, evidence of the good reputation of the accused may in itself create a reasonable doubt where none would otherwise exist, and the court must so charge when requested, and it was not enough for the court to charge that the jury might take such evidence into consideration when passing upon the facts.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1838–1845; Dec. Dig. § 776.*]

3. CRIMINAL LAW (§ 776*)—CHARACTER OF ACCUSED—EVIDENCE.

In proving the good reputation of an accused on a criminal charge, the inquiry is properly directed to the particular trait which is involved in the charge itself; and hence in a prosecution for murder the evidence as to the good reputation of the prisoner for peace and quietness is sufficient to support an instruction that the good reputation of accused is sufficient of itself to create a reasonable doubt.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1838–1845; Dec. Dig. § 776.*]

4. HOMICIDE (§ 163*)—CHARACTER OF ACCUSED—EVIDENCE.

In proving the reputation of an accused in a prosecution for murder, evidence of his reputation in various shops in which he had been employed was competent evidence of his general reputation.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 310–317; Dec. Dig. § 163.*]

5. WITNESSES (§ 37*)—COMPETENCY—CHARACTER OF ACCUSED.

In proving the general reputation of an accused, evidence by witnesses based upon their own personal observation, and not as to general reputation, was not competent.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 80–87; Dec. Dig. § 37.*]

6. CRIMINAL LAW (§ 776*)—TRIAL—REQUESTED CHARGE.

Defendant's request that evidence of good character may in itself create a doubt when none would otherwise exist should not have been

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

refused because of the use of the word "doubt" instead of "reasonable doubt," as its meaning was plain.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1838–1845; Dec. Dig. § 776.*]

Appeal from Trial Term, Kings County.

Vincenzo Buccufurri was convicted of manslaughter in the first degree, and he appeals. Reversed, and a new trial granted.

See, also, 154 App. Div. 827, 139 N. Y. Supp. 305.

Argued before JENKS, P. J., and BURR, CARR, RICH, and PUTNAM, JJ.

John Palmieri, of New York City (Samuel Wechsler, of New York City, on the brief), for appellant.

Edward A. Freshman, Asst. Dist. Atty., of Brooklyn (James C. Cropsey, Dist. Atty., of Brooklyn, and Harry G. Anderson, Asst. Dist. Atty., of New York City, on the brief), for the People.

CARR, J., The defendant appeals from a judgment of the Supreme Court in Kings County, by which he was sentenced to imprisonment on an indeterminate sentence of the maximum of ten years and two months and the minimum of nine years. This judgment was entered upon the verdict of a jury that convicted the defendant of the crime of manslaughter in the first degree. He was indicted for the murder in the first degree of one Robert Witl, on the 2d day of December in the year 1910, in the borough of Brooklyn, in the county of Kings. At the trial, the theory of the defense was that of justifiable homicide.

It is urged upon this appeal by the appellant that the commission of any crime on the occasion in question was not established at the trial beyond a reasonable doubt, and further objection is made as to the rulings of the trial court in the admission and exclusion of evidence, and particular stress is laid upon an alleged error of the trial court in refusing a request made by the defendant for an instruction to the jury. The defendant was a workman in a shoe factory, and the decedent· was his foreman. Bad blood had developed between these parties on the afternoon of the day before the killing. On the morning of the homicide, the defendant came to the factory in question with a five-chamber revolver in his overcoat pocket. He hung his overcoat upon a rack on the wall of the workroom, and went to his bench, where he sat down. In a short while the decedent, Witl, came to him with the wages already earned by the defendant, and said that he (the defendant) was discharged and should leave the factory. It seems that the quarrel which arose between these parties had some reference to the fact that Witl had discovered that the defendant was in some way connected with a labor union and was receiving membership dues from certain operatives in the factory. On the day before the homicide, Witl told the defendant that he would procure his discharge. The defendant then appealed to a Mr. Treat, who was the superintendent of the factory, and a colloquy took place between Treat, the defendant, and the foreman Witl, in which Mr. Treat advised Witl not

to have the defendant discharged but to allow him to stay at work for some time. This took place towards the close of the working day. When Witl approached the defendant the next morning, angry words took place between them, in which Witl accused the defendant of being a "ruffian," in that the defendant had appealed, over his head, to the superintendent of the factory. The defendant appears to have answered that not he, but Witl, was a "ruffian," in that Witl had gone to the employer and procured the defendant's discharge from work, thereby taking away his "bread and butter." Witl thereupon struck the defendant on the mouth with his hand, thereby causing a slight bruise or cut from which some blood oozed on the lips of the defendant. A number of workmen who were near by got up from their benches and separated the defendant and Witl, and some of them advised Witl to leave the room while the defendant was there. Witl, however, ordered the defendant from the room, and he had in his hand a wooden last which served as a model for the making of women's shoes. In a few moments the defendant fired five shots at Witl, one of which struck Witl in the abdomen, another grazed his hips near the buttocks, another struck him on the side of the arch of the left foot, another imbedded itself in a door which led from the work-room to a staircase, the fifth being unaccounted for. The wound in the abdomen was mortal, and Witl died three days thereafter.

The question litigated at the trial was whether the defendant fired these shots at Witl when the latter was going away from him towards the door, or whether the latter was shot while he was advancing upon the defendant with this wooden shoe last in his hand. The prosecution produced three witnesses as to shooting, one Ondik, one Marino, whose name, however, appears in the printed record as Herino, and one Ruffle, whose testimony was that of most importance for the prosecution and seems to have been strongly considered by the jury, for the record shows that after the jury had retired they returned with a request that the testimony of Ruffle be read to them again, which was then done under the direction of the trial court. The witness Ondik was a foreigner with poor command of the English language, and his testimony makes rather hard reading and sheds but little light upon the actual occurrence. Marino was an important witness as to the events which preceded the homicide and as to some of the actual occurrences of the killing. Ruffle did not speak Italian, and he did not know much of any of the occurrences preceding the final dispute in which the killing was done. According to his testimony, the decedent was trying to avoid the defendant at the time the defendant opened fire upon him.

After the homicide, the defendant left the factory and was pursued by Treat and Ruffle. He went into the rear room of a barber shop and left there on a shelf the revolver which he had used and which contained five empty cartridges. This weapon was found there subsequently by the police and produced upon the trial; the defendant admitting his ownership of it. Among the police officers making the arrest was one Garner. This officer testified that the prisoner told him that he had shot the decedent because "he was taking the bread and butter out of his mouth," and that he had bought the gun "the night

before." On cross-examination Garner admitted that he had given no testimony before the coroner as to the defendant's alleged statement as to the time of the purchase of the revolver, but explains that the omission was due to the fact that he was not asked about it, but it appears that he did state before the coroner that the defendant had said to him that the reason why he had shot Witl was that Witl had taken the bread and butter from him and that he got excited and shot him. As a part of the case of the prosecution, the coroner's physician, Hartung, described the location and nature of the wounds as disclosed by a post mortem examination. This witness said he could not tell how the deceased was standing when he received the wound in the foot, but that as to the wound in the abdomen "he was facing whoever shot him." The location of the wounds was described as follows:

"A pistol shot wound on the outer side of the *left* foot. * * * There was another pistol shot wound on the *right* side, on the outside of the upper portion—that is, by the buttocks—just a graze. Then there was a pistol shot wound three inches to the right and three inches below, one wound right in the right side of the abdomen."

The defendant took the stand on his own behalf and produced several witnesses who claimed to have seen the shooting, Amadeo, Valenti, and D'Angelo. These witnesses corroborated the main story of the defendant. His story of the shooting was that, when he received notice of his discharge, Witl called him a "ruffian" and a "spy," and that he retorted in kind; that Witl thereupon struck him in the mouth, and several nearby workmen came up and separated them; that he (the defendant) announced to the bystanders that he was going down to inform the employers how workmen were treated in the shop, and that he started to the door; that Witl, with a shoe last in his hand, was between the door and himself and advanced upon him angrily; that he thereupon fired one shot into the door to frighten Witl, who still advanced upon him; and that then he fired four shots, one after the other, not to kill Witl, but to wound him in order to defend himself. He denied that he told the policeman Garner that he had bought the revolver the night before, and produced a public school teacher who testified that on the night before the homicide he (the defendant) was in attendance at night school from 8 p. m. to 10 p. m. He testified that he had this revolver five years or more, but did not carry it about his person until a few months before the homicide, when he began to carry it as he had valuable jewelry and a considerable sum of money on his person and was obliged to go to and from the factory at hours when it was dark, and that he feared robbers.

[1] If the jury had accepted the story of the defendant and his witnesses, they might have found a verdict of acquittal on the ground of justifiable homicide. The defendant did not "retreat," but he was not bound to retreat if such would imperil his safety the more, or if a reasonable man under the circumstances would be justified in believing that to retreat was to add to the imminent danger. People v. Jeina, 125 App. Div. 697, 110 N. Y. Supp. 83.

[2] The defendant introduced evidence as to his previous good reputation for peacefulness and quietness. The trial court in its

143 N.Y.S.—5

charge to the jury did not refer at all to this evidence or as to the permissible or possible effect of such evidence on the question of reasonable doubt as to the commission of a crime. At the close of the main charge, the court was requested to charge as follows:

"Now I ask your honor—and this is my last request—to charge the jury that the defendant has presented evidence of good character by these various foremen and other persons, and upon that question I ask your honor to charge the jury that evidence of good character is proper evidence on the question of whether the defendant is a person of peaceful habits, and it may create in this case, of itself, evidence of good character, may in this case of itself create a doubt where none would exist otherwise."

To which the court replied:

"Give him due consideration for his character, if you believe his character is good in passing on the evidence."

The defendant then excepted. It is contended that this ruling of the court constituted fatal error. It is answered that there was in fact no evidence of good character presented by the defendant, and that therefore the request was refused properly. The defense in offering evidence as to the defendant's good reputation confined their inquiry to his reputation for "peace and quietness." Some of this evidence was given as to his reputation generally in his community, and some as to his reputation in the various shops in which he had worked.

[3] In proving the good reputation of one on trial on a criminal charge, the inquiry may be directed to the particular trait which is involved in the charge itself; that is, if the charge is one of unlawful violence, evidence may be given as to reputation of the prisoner for peace and quietness. People v. Van Gaasbeck, 189 N. Y. 408, 82 N. E. 718, 22 L. R. A. (N. S.) 650, 12 Ann. Cas. 745. Hence there was evidence in the case of the good reputation of the defendant material to the issue involved in the charge.

[4] While some of the evidence related to the reputation of the defendant in the various shops in which he had been employed, rather than to that in the community generally, still it was competent, as the shop life was a large part of the defendant's life and brought him under close observation by a large number of persons.

[5] There was other evidence given on behalf of the defendant by various witnesses, based upon their personal observation of him and not as to general reputation; but this evidence, though admitted by the trial court, was not competent (People v. Van Gaasbeck, ut supra), and though in the case may not be considered as evidence of good reputation. There was, however, as before stated, some evidence in the case of the defendant's previous good reputation. This being so, let us consider the ruling of the trial court in this light.

[6] That evidence of good reputation may in itself create a reasonable doubt even where none would otherwise exist, and that it is the duty of a trial court to so instruct a jury when requested, is the settled law of this state. People v. Bonier, 179 N. Y. 315, 72 N. E. 226, 103 Am. St. Rep. 880. It is not enough for the court to instruct the jury that they may take such evidence into consideration when passing upon the facts, but they must be instructed as to the effect which

they may give to such evidence if they believe it. People v. Bonier, ut supra. It is argued that as the request used only the word "doubt," and not the words "reasonable doubt," it was refused properly. But in this particular the request was practically the same as that used in People v. Elliott, 163 N. Y. 11, 57 N. E. 103, where it was held that a refusal to so charge was fatal error which required a reversal of a judgment of conviction. This last-cited authority is referred to with approval in People v. Bonier, ut supra. True, this request was framed in a crude, inarticulate manner, yet its obvious intention was plain, and the court should have instructed the jury adequately as to the legal bearing of the question which it raised.

I think there was error sufficiently serious to require a reversal of the judgment of conviction and a new trial, and I so recommend. All concur.